YEAMAN et al. v. GALVESTON CITY CO. et al. (No. 5553.)

(Court of Civil Appeals of Texas. Galveston. June 22, 1911. Rehearing Denied Feb. 11, 1915.)

1. CORPORATIONS ⊙⟲170—ARTICLES OF ASSOCIATION—COMPLIANCE WITH BY STOCKHOLDER—EFFECT.

Five trustees' certificates, each representing $1/1000$ part of the total town site of the city of Galveston, deeded by the owners to trustees, were purchased from the trustees under recitals of a trust agreement providing in detail for the organization of a joint-stock company to be carried out by owners and purchasers of such trust certificates. *Held*, that by ownership of such certificates, ipso facto, without any further action on his part, the buyer became a stockholder in a corporation subsequently formed on its organization in accordance with the terms of the trust instrument recited and referred to in the trustees' certificates; and such certificates acquired the status of shares of stock whether or not the purchaser surrendered them to the company for cancellation in exchange for new stock as a prerequisite of his right to share in dividends under a stockholders' resolution to that effect.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 624–632; Dec. Dig. ⊙⟲170.]

2. TRUSTS ⊙⟲191—AUTHORITY OF TRUSTEE—SALE OF CERTIFICATES.

It was immaterial that the trustees' certificates were purchased before formation of the joint-stock company, but after the trustees had conveyed the property to its so-called "Board of Directors" since, as between the parties, the company was formed when the trust agreement was made, its provisions forming the company's charter, and the trustees' conveyance to the directors not having any effect on the trustees' authority to sell the original owners' shares remaining unsold in their hands, the ownership of the beneficial interest in all unsold stock being in the original owners of the land, grantors in the deed of trust.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 243; Dec. Dig. ⊙⟲191.]

3. CORPORATIONS ⊙⟲100—ISSUE OF STOCK—EFFECT OF IRREGULARITY.

Technical irregularities in the issuance of stock of a corporation will not affect the rights of the parties as between themselves, where the rights of third parties have not intervened; there being no lack of notice, and the transaction being long acquiesced in by the corporation now seeking to deny to holders of irregularly issued stock the rights of stockholders, especially where the incorporating authority recognized the

rights of holders of such stock in its incorporating grant.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 450, 451; Dec. Dig. ☞100.]

4. CORPORATIONS ☞173 — REPUDIATION OF TRUST — NOTICE TO EXCHANGE IRREGULAR STOCK—REPUDIATION OF IRREGULARLY ISSUED STOCK.

Notice on the part of a corporation by publication in newspapers that holders of original trustees' certificates could not draw dividends until such certificates had been exchanged for shares of stock in the corporation proper was not notice on the part of the corporation of an attempt to forfeit all rights against it of such holders of such certificates unless the exchange was made.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 640–648; Dec. Dig. ☞173.]

5. LIMITATION OF ACTIONS ☞103—TRUSTS— CORPORATION AS TRUSTEES FOR STOCKHOLDERS.

A corporation holding its assets in trust for the benefit of its stockholders cannot plead limitation against its beneficiaries' demand until repudiation of the trust by it.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 500, 506–510; Dec. Dig. ☞103.]

6. CORPORATIONS ☞189 — AS TRUSTEES FOR STOCKHOLDER—REPUDIATION—EVIDENCE.

Evidence held insufficient to show repudiation by defendant corporation of plaintiffs' ancestor's rights as a stockholder.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706–722; Dec. Dig. ☞189.]

7. LOST INSTRUMENTS ☞18—SUIT UPON—AUTHORITY OF COURT TO TAKE INDEMNITY BOND AS CONDITION PRECEDENT TO RECOVERY.

In a suit on lost stock against a corporation for dividends or division of capital, the court may order an indemnity bond to be given to defendant as a condition precedent to plaintiffs' recovery.

[Ed. Note.—For other cases, see Lost Instruments, Cent. Dig. §§ 41–45; Dec. Dig. ☞18.]

8. CORPORATIONS ☞189—CORPORATE STOCK— ESTOPPEL OF CORPORATION TO DENY VALIDITY—SUFFICIENCY OF EVIDENCE.

Evidence *held* insufficient to show estoppel in pais of corporation to deny validity of certain trustees' certificates as shares of stock in it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706–722; Dec. Dig. ☞189.]

9. CORPORATIONS ☞170—ARTICLES OF ASSOCIATION—RIGHTS OF STOCKHOLDER THEREUNDER—CONSTRUCTION.

Where the parties to the original transaction were dead, the construction actually placed by the corporation upon a trust instrument that regulated its internal affairs, and the rights accorded to holders of trustees' certificates issued thereunder as shareholders in such corporation, were proper to be considered in determining the status as shareholders in the corporation of the owner of lost certificates of stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 624–632; Dec. Dig. ☞170.]

Appeal from District Court, Galveston County; Robt. G. Street, Judge.

Action by S. M. Yeaman and others against the Galveston City Company and others. Judgment for defendants dismissing the suit, and plaintiffs appeal. Reversed and remanded.

For answer to questions certified to Supreme Court, see 167 S. W. 710.

G. E. Mann and Kleberg & Neethe, all of Galveston, and S. M. Yeaman, of New York City, for appellants. Stewarts, of Galveston, E. A. Hawkins, of Los Angeles, Cal., and James B. & Charles J. Stubbs, of Galveston, for appellees.

PLEASANTS, C. J. This suit was brought by appellants, who, as successors in title of Robert Triplett, deceased, claim to be the owners of five shares of the capital stock of the Galveston City Company, a private corporation having its domicile and place of business in the city of Galveston, Galveston county, Tex. The suit is against the Galveston City Company and against Maco Stewart, the president of said company in his individual capacity. The purpose of the suit is to establish plaintiffs' rights as stockholders of said company, to recover dividends due them as such stockholders, to set aside a sale of the lands of said company made by its board of directors to the defendant Stewart, and to enjoin the proposed dissolution of said corporation by the majority of its stockholders. The petition, which covers many printed pages of the transcript, contains a full history of the organization of the defendant company, a statement of the basis upon which it was capitalized, and its original capital stock issued, the method pursued in issuing said stock, and the facts and circumstances relied upon to show a continued recognition by the defendant company up to a short time before the filing of this suit of the rights of the owners of the stock issued to Robert Triplett as stockholders in said company.

Succinctly stated as can be for a proper elucidation of the questions decided in this opinion, the facts alleged in the petition are as follows: Prior to April 11, 1837, M. B. Menard claimed to own the whole of the league and labor of land granted to him by the Republic of Texas, situated on the east end of Galveston Island, and Robert Triplett, for himself and for Sterling Neblett and William F. Gray, claimed to own a portion of said league and labor of land. On the date last named, Menard and Triplett, who acted in the premises for himself and co-claimants, compromised their differences by a division of the land. Under this partition agreement, Menard released to Triplett a specific 640 acres of the land and received from Triplett a conveyance of all of the remainder of the survey. Before this settlement was made, it was the intention of all of the parties thereto to have said land subdivided into lots and blocks of varying sizes and to establish a city thereon. After this settlement was made, the Triplett 640 acres was conveyed to Thomas Green, Levi Jones, and William R. Johnson in trust, to be for the benefit of Triplett and his co-owners, subdivided and sold in the man-

ner designated in said trust conveyance, and the balance of the survey was conveyed by Menard to Levi Jones in trust to be disposed of for his benefit in accordance with the terms of his trust conveyance. Acting under this deed of trust, Jones offered for sale certificates of ownership of a $1/1000$ interest in said land, and prior to the 15th day of June had issued 400 of such certificates. On the date last named, a new agreement was made and entered into between the owners of the land and the trustees before named. This agreement, after reciting the facts above stated, contains the following:

"And, whereas, it being in the contemplation and intention of all the parties to these presents, that the said league and labor of land should be laid off into lots, for the purpose of building a town thereon; and it being found most beneficial to all parties concerned, that the whole of the said league and labor of land should be held on joint account, in the proportions hereinafter specified, and should be under the control, and at the disposition of the same set of commissioners or trustees, acting under common plan in regard to the whole, instead of being held partly by said Jones, and partly by the said Thomas Green, L. Jones and W. R. Johnson, under different titles and plans, whereby injurious competition and conflicts of interests may be produced, now, in consideration of the premises, the parties of these presents have mutually agreed and covenanted to, and with each other, as follows; that is to say:

"That the said league and labor, of four thousand six hundred and five acres of land, shall be conveyed to the said Thomas Green, Levi Jones and William R. Johnson, in fee simple, as trustees and commissioners to execute and carry into effect the purposes, terms and intentions of this agreement.

"That the said league and labor of land shall, by the said trustees or commissioners, be divided into one thousand shares, of which the four hundred shares for which certificates have already been issued by the said Jones shall be regarded as four hundred shares, and the lawful holders of the said certificates shall be on the same footing and entitled to the same rights with the holders of certificates issued under the present articles, and upon surrendering their said certificates new certificates, in lieu thereof, shall be issued by the said commissioners or trustees.

"That the remaining six hundred shares shall be sold by the said trustees and commissioners, in such manner as they shall think expedient; but no share to be sold for a less sum than fifteen hundred dollars, unless a majority of the said trustees should be of opinion that it would be expedient to reduce the price, a discretion therein being given to said trustees or commissioners. A certificate, signed by at least two of said commissioners, shall be issued to every purchaser who shall have a right to demand a separate certificate for each share, or may embrace any number of shares in one certificate. The certificates shall be transferable by assignment made in writing thereon and signed and sealed by the holder and acknowledged in the presence of two witnesses, before any justice of the peace or notary public.

"The proceeds of sale shall be applied as follows: The expense of the trust or commission shall be first deducted, and the balance shall be divided into three equal parts, of which one part shall be paid to the said Robert Triplett and those claiming under or through him, and the other two parts to be paid to the said M. B. Menard and those claiming under or through him. It is, however, agreed between the parties, that a sum not exceeding fifty thousand dollars, shall be deducted out of the first proceeds of sale, after expenses paid to be applied to the payment of a debt due from the said Menard to David White of Mobile, Alabama, which debt is believed to be less than fifty thousand dollars; and no further payment shall be made by the trustees or commissioners, to or on account of the said Menard, or those claiming through or under him, until a proportional sum, that is to say, one-third of fifty thousand dollars, or of the sum applied to the payment of the said White, if a sum less than fifty thousand dollars should be so applied, shall have been paid to the said Triplett, or those claiming by or through him. But in case a sum sufficient to repay to the said Triplett or those claiming by or through him, his one-third part of the money applied to the payment of the said White, should not be raised from the sale to be made by the said trustees; then the said M. B. Menard acknowledges himself to be indebted to the said Triplett, or those claiming by or through him, to the amount of one-third of the sum so applied to the payment of the said White, and promises to pay the same. It is also expressly agreed that this stipulation for the payment of the said White is merely an agreement between the parties to these presents, and not an acknowledgment of any liability on the part of the said Triplett, or those claiming by or through him, to pay the debt due from the said Menard to the said White, or intended to create any lien in favor of the said White, or to give any security for the payment of his debt, but is subject at all times to a rescission by agreement between the said Menard and the said Triplett and of those claiming by or through them.

"It is further agreed that so much of the said four hundred shares for which certificates have been issued as aforesaid, by the said Jones, as now are in the hands of said Jones, or of any of the parties to these presents, or of their agents and subject to their control, shall not be sold for less than fifteen hundred dollars per share, unless the trustees or commissioners shall determine to reduce the price of shares as aforesaid, but if the price of shares shall be so reduced then the price of what remains of the said four hundred shares may likewise be reduced, it being hereby agreed that what remains of the said four hundred shares shall at no time be sold for a less price than that demanded by the trustees or commissioners for the shares sold by them. It is further agreed, that if the said Menard or those claiming through or under him, or the said Triplett, or those claiming through or under him, should choose to become purchasers of shares, the trustees or commissioners shall not demand payment in cash for their purchases but shall issue certificates to them, or either of them, and charge the same to their proportion of the amount to which they would be entitled in case the whole number of shares were sold. Provided, however, that their respective purchases, so to be credited, shall not exceed the amount to which they would have been respectively entitled.

"The trustees or commissioners shall, as soon as in their opinion a sufficient number of shares shall have been sold, call a meeting of the shareholders, at such time and place as shall be designated by them, of which they shall give sufficient and convenient notice to the shareholders, but they shall not be bound to give other notice than by advertisement in the newspapers. At the meeting of the shareholders each share shall be entitled to one vote, and the shareholders may appear and vote by proxy. So much of the shares for which certificates have been issued by the said Jones, as aforesaid, as shall remain unsold, shall be represented by the said Menard; and so much of the six hundred shares to be sold by the trustees as shall remain unsold, shall be represented, as to two-thirds thereof, by the said

Menard, and as to the other third by the said Triplett or those claiming by or through him.

"The trustees or commissioners shall hold the title to the said league and labor of land by these presents vested in them, subject to the orders of the shareholders, as adopted at their general meetings and the rules and regulations prescribed by them. They shall make all conveyances which they shall be required to make by the shareholders as aforesaid; any two of them may make conveyances and perform all other acts; and in case of the death or refusal of either of the trustees to act, the other two may appoint a third in his place by writing, under their hands and seals. The trustees shall be responsible, each, only for his own acts and receipts.

"Any sale made by the said Jones or those appointed by him, of ten squares or parts of squares or any less number by virtue of the powers granted to him by the said Menard, by the deed between them as aforesaid, is hereby ratified.

"The trustees or commissioners shall have authority to appoint all necessary agents for the sale of shares.

"And, in consideration of the premises, the said Jones, Green and Johnson do hereby release to the said Menard and Triplett all their right and title under the aforesaid deeds and conveyances, and the said Menard and Triplett, for and in consideration of the premises and for the sum of ten dollars, to them in hand paid by the said Green, Jones and Johnson, the receipt whereof is hereby acknowledged, do give, grant, bargain, sell, release and confirm the said league and labor of land unto them, the said Green, Jones and Johnson, to have and to hold the same to them and the survivor of them and their heirs of the survivor of them upon trust to execute the above set forth agreements of the parties to these presents, and the said M. B. Menard, for himself, his heirs, executors and administrators, the above-granted league and labor of land unto the said Green, Jones and Johnson and their assigns and the survivor and the heirs and assigns of the survivor shall, will and doth warrant and forever defend by these presents.

"In testimony whereof the parties to these presents have hereunto set their hands and seals, the day and year first above written."

The following summary of the further allegations of the petition is copied from appellants' brief:

"The trustees or commissioners at once had 1,000 certificates of joint stock printed, 5 books of 200 certificates each. These books are lettered A, B, C, D, and E. Books A and C were given to Jones to satisfy the 400 shares mentioned in the deed of trust. The trustees printed a circular, June 20, 1837, entitled, 'Proposals for Sale of Stock in Galveston City.' In this they recited conveyance of the 4,605 acres of land 'to be sold in joint stock in one thousand shares.' They state that 400 shares have been disposed of, and they offer 600 at $1,500 a share, 10 per cent. to be paid 'when the whole shall have been subscribed,' and, when satisfactory assurance has been given for deferred payments, 'certificates of stock will be issued to the subscribers, and a general meeting called to make arrangements for the sale of lots,' etc."

The certificates issued by the trustees recite, as a preamble:

That the 4,605 acres on east end of Galveston Island are to be sold "as joint shares"; that the trustees "are to call a general meeting of the shareholders when deemed advisable." "In the proceedings of the stockholders in general meeting, each share to be entitled to one vote, and to be represented in person or by proxy, and a majority in interest to determine all questions which may arise. The company may prescribe such rules and regulations for its government and management, and give such orders and directions to the trustees for the sale of lots, or any other purpose, as it may think promotive of general interest."

The body of the certificate itself, that follows this preamble, designates the interest of the grantee, naming it as "one share," giving book and number, "in the city of Galveston, to be holden and enjoyed under terms prescribed in the deed of June 15, 1837, to us as trustees."

Under call duly made by the trustees, a general meeting of stockholders, owners of the 1,000 shares issued by the trustees of fully paid-up, nonassessable, joint stock, whose capital was the league and labor of land, was held at Galveston, April 13, 1838, and the majority of the shares voted; a directory was elected, who organized and elected M. B. Menard president. The trustees made report to this stockholders' meeting of the shares sold. The stockholders elected a secretary and agent of the company, directed sale of lots; made provision that shares at par of $1,000 could be taken in by the company in pay for lots sold, when desired by buyers; that charter of incorporation should be applied for by the company. The stockholders' meeting called the company "Galveston City Company"; directed that as soon as charter could be had, or sooner if not had from Congress then in session, a book should be opened by secretary for "registration and transfer of stock, in modes similar to that usually adopted in the transfer of bank stock, in order that the dividends arising from sales may be correctly and rightfully disbursed and paid over to proper parties." It was further resolved that:

After the transfer book shall have been opened, "it shall be the duty of holders of certificates to file and register them, receiving in lieu thereof a certificate under the seal of the company, stating the number of shares to which the party is entitled, which last certificate shall not be transferable except on the regular book of transfer of the company, and shall be necessary in every case to enable the shareholder to receive the dividend due him."

The stockholders at that meeting further ordered the opening of a book called "Journal," in which to record all sales of lots, and when sold for stock the agent was instructed to keep a record of the shares canceled by the sales, and instructed to see to the careful preservation of the surrendered trustee certificates. The Galveston City Company has the minutes of the stockholders' meeting, and subsequent meetings to date; it has 991 of the 1,000 trustee certificates that have been taken up either in sales of lots or by issuance in lieu thereof of renewal certificates; it has the original stubs of "Book E of Trustee Certificates," which show the issuance to Robert Triplett of the five certificates for five shares, as hereinafter set out; it has a book entitled "Agents' Reports and Stock Register, Galveston City Company,"

which is a record of each of the 1,000 shares issued by the trustees, to whom issued, and giving the book out of which they were issued, and giving the number of each certificate and date of respective issuance. This stockholders' meeting of April, 1838, also directed the trustees to deed the league and labor of land, the capital of the joint-stock company, to the directors of tne company, and this order was complied with by deed of date April 12, 1839, in which is fully set out that the deed is in compliance with the terms of the trust and commission instrument of June 15, 1837, and orders of the stockholders. Under the instructions of the stockholders, the secretary and agent of the Galveston City Company promptly opened a book for transfer of stock called "Stock Ledger," on which is registered each and every share of the trustee stock, when the trustee certificate representing the share was presented for a transfer, and renewal certificate given in renewal of the trustee certificate. The stock ledger now shows that 991 of the 1,000 shares have had their original trustee certificates surrendered and renewed certificates entered on the stock ledger, leaving still outstanding nine trustee certificates that have never been presented for renewal, and the sales of lots journal shows that the 9 shares represented by the outstanding trustee certificates have never been bought up by the Galveston City Company for lots sold, and the 9 shares stand as originally issued.

One of the three trustees, Levi Jones, was, in 1838, made, by vote of stockholders, agent and secretary of the Galveston City Company. Annual elections were held by the stockholders in general stockholders' meetings, and the joint-stock unincorporated company, Galveston City Company, was conducted from its formal organization for business on April 13, 1838, to date of incorporation, February 5, 1841, just as if the company had been incorporated; and on that day the "stockholders of the Galveston City Company were incorporated under same name and style by the Congress of the Republic." At date of incorporation, the stock ledger contained less than one-third of the 1,000 shares, as no share goes on the ledger until the trustee certificate is presented for renewal, and over two-thirds of the trustee certificates had not been presented for renewal.

The directory, elected by stockholders in 1840, continued on after incorporation until the annual election in 1841. The Galveston City Company, incorporated, continued on. The stockholders, owners of the 1,000 shares, or so many of these shares as had not been canceled by the Galveston City Company in buying lots, voted at election of directors, at the annual meeting of the corporation. The sole business of the corporation was selling its land, its capital, in town lots.

As the deed from the owners of the league and labor, Menard and Triplett, to Green,

Jones, and Johnson, trustees, of date June 15, 1837, and the deed from those trustees to the directory of the Galveston City Company, of date April 12, 1839, had not been recorded, to simplify title of record in dealing with third parties, a deed was, on January 1, 1842, taken direct from M. B. Menard, the president of the corporation, to the corporation and duly recorded, and is the record title as between the corporation and third parties, although as between the stockholders and the corporation the title is as above set out.

The stock of the corporation, the Galveston City Company, was for many years sold as low as $125 to $200 a share. Lots were paid for almost universally in stock when the corporation sold, until about 1875. In 1855, the annual stockholders' meeting passed a resolution, and had it published in newspapers in the cities of New Orleans, Richmond, Va., and New York, to the effect that there were 40 shares of the stock of the Galveston City Company, the trustee certificates for which were still outstanding, and giving notice that, until the trustee certificates were renewed, the owners of the shares could neither vote their shares nor draw dividends when due thereon. In 1876, it was stated by the Galveston City Company, in an agreed statement of facts for appeal in suit of Galveston City Company v. Sibley, 56 Tex. 269, on one of the shares, the trustee certificate of which had been lost, that the Galveston City Company had canceled by sale of lots all but 50 shares of its stock, and, of these 50, 10, including the Sibley shares, were represented by trustee certificates still outstanding. To avoid any misunderstanding, the Galveston City Company in that agreed statement of facts said "that these trustee certificate shares are perfectly valid shares."

In 1876, the Galveston City Company made its first distribution of net proceeds of sales, and in doing so put aside for the 9 shares represented by the outstanding trustee certificates their pro rata. Some years later, when next distribution or dividend was made, under advice of eminent lawyers, it was decided that, after so great a lapse of time, chance of owners of the 9 shares turning up was so remote, and the capital of the corporation was so ample, that all the money in hand could safely be distributed to and paid to the renewed certificate shares, leaving the 9 lost certificate shares to get their shares of proceeds of sales of lots, when the owners of these 9 shares demanded same. This policy was pursued by the corporation up to July 7, 1909, when, as accumulation of sales of several years, the corporation had on hand cash and bills receivable equivalent to $222,609.88, and the unsold land, its capital, assessed by the corporation for 1909 taxes at $187,000, and the stockholders not in directory were clamoring for a distribution to the 24 shares, all the remaining stock represented by renewal certificates. On advice of E. A. Hawkins, Jr.,

the attorney representing the corporation (and also secretary and agent of the corporation), the directory refused to make such distribution, as each of the 24 renewed certificate shares had received $32,500, distributed to them out of proceeds of sales of the capital, not counting in the 9 trustee certificate shares, to whom nothing had been paid; and the further payment to the 24 shares until the same amount had been paid to the 9 might make the directors personally liable to the owners of the 9 shares. This being the situation, and with full knowledge of all the facts, the defendant Stewart, at meeting of stockholders, July 7, 1909, reported he had bought out the president's stock and others at $10,000 a share, and voted as owner of 15 shares of the 24 shares entitled under by-laws to vote as the renewed certificate shares represented on the stock ledger; elected himself and his office force, a share transferred to each to qualify as director, and was elected president by his directory; and the president had passed resolutions (over protest of minority of the said voting shares) that the shares should be taken for property at a valuation of $10,000 a share; that the land, unsold, of the capital of the corporation, should all be sold in four parcels at private sale on a day named less than 10 days off, and adjourned the stockholders' meeting to that day; and on that day reported that there was but one bid, and that was his own of $40,000; had the sale confirmed by the vote of his majority stock (over protest of minority); had deed made, paid into the corporation for the property 4 shares of the stock, leaving in his (the defendant Stewart's) name, and the names of his directory, 11 shares, and that the majority of the stock and the directory, dominated by the president, then passed a resolution to liquidate and dissolve the corporation on August 28, 1909, and to distribute to the then remaining 11 shares of renewed certificate stock all the cash and bills receivable, which constituted all the remaining assets of the Galveston City Company. The president then, through his directory, bought up the shares of stock represented by renewed certificates with 90-odd thousand dollars of the cash on hand of the corporation, leaving the 11 shares owned or controlled by the president the only shares of the capital stock, other than the 9 outstanding trustee certificate shares.

Petition alleges that the books of the Galveston City Company show that, of its original capital stock of 1,000 shares, 980 shares have been canceled by the company for lots sold, and that the remaining 20 shares are represented, 9 shares by original trustee certificates (or were, and the certificates are lost), and the other 11 shares are represented by renewed certificates, and are owned or controlled by the defendant Stewart, the president of the corporation; that of the 9 shares, as to which the original trustee certificates have never been renewed, 5 belong to the plaintiffs, the heirs of Robert Triplett, deceased, and the other 4 shares to the respective heirs of the original persons to whom they were respectively issued, and all 9 shares stand on the books of the Galveston City Company as valid shares, part of the 1,000 original shares, and, after the trustee certificates representing same have been outstanding 60-odd years, there is presumption that these 9 certificates are lost or destroyed.

The petition alleges search by plaintiffs for the 5 certificates and failure to find, application to the defendant corporation, and denial of the president of any knowledge of there being any shares but those he owned. Petition alleges full knowledge of all facts by the defendant Stewart, and that he bought the controlling stock of the voting shares, his 15 in number, with full knowledge of all facts, and that one of the inducements of the sale of stock by the former president of the corporation made to Stewart was to avoid the responsibility of any personal liability as to the cash on hand; and petition alleges that Stewart bought the controlling interest to get control of said cash and intending to apply all the assets and capital to use of his shares and to deprive the 9 lost certificate shares of all property rights.

Prayer is that the deed of the capital, the land of the corporation, to defendant Stewart be canceled as unlawful, because consideration is inadequate, and sale of all the capital was made over protest of the then voting shares of other than those the president controlled, and because a president cannot buy from a corporation except by unanimous consent, and because the corporation was organized to sell 4,605 acres of land at retail in town lots, and the remaining land cannot, except by unanimous consent of stock, be sold as a whole (total capital) in bulk. Injunction is prayed as to paying any part of cash on hand to the 11 renewed certificate shares until all the 9 trustee certificate shares have received an amount equal to the amount that has been paid to each of the 11, to wit, $32,500, and that the dissolution of the corporation be enjoined; that the 5 shares, and the other 4 of the 9, be protected in their rights, and certificates issued to plaintiff for the 5 shares standing on the books of the corporation in the name of Robert Triplett; and that have stood there for nearly 70 years and no adverse claim there asserted.

To this petition appellee interposed a general demurrer and 28 special exceptions, the nature of which will be hereafter indicated. The trial court sustained all of the special exceptions, and, plaintiffs declining to amend, their suit was dismissed.

The briefs filed in this case are lengthy and discuss with much learning and ability the various points presented by defendant's exceptions to plaintiffs' petition. We shall not attempt in this opinion to discuss or de-

cide in detail all of the questions presented, but will content ourselves with a general statement of our conclusions upon the material questions raised by the exceptions.

Many of the assignments of error are not presented in appellants' brief in accordance with the rules, but the points hereinafter discussed are sufficiently presented to require our consideration.

One of the objections to the petition, raised by the exceptions presented by defendant which goes to the foundation of plaintiffs' cause of action, is: That the petition shows that the five trustees' certificates issued to Robert Triplett do not represent shares of stock in the joint-stock company known as the Galveston City Company, nor in its successor, the defendant corporation, but each of said certificates only conferred upon said Triplett title as a tenant in common to a 1/1000 interest in the league and labor of land and the right to become a stockholder in said joint-stock company and its successor corporation by surrendering such trustees' certificate and receiving therefor a renewal certificate issued by the stock company or corporation; and that the demand of plaintiffs for renewal certificates in lieu of the five lost trustees' certificates, made shortly before the filing of this suit, is a stale demand, and plaintiffs are barred in such demand by their laches and by the statute of limitation.

[1] If the contention that the trustees' certificates issued under the provision of the trust agreement before set out were not certificates of stock in the joint-stock company, and that the holders of such certificates did not become stockholders in the corporation subsequently chartered, unless they surrendered such certificates and received in lieu thereof certificates issued by the stock company on the corporation, is sound, we think the pleas of stale demand and limitation precluded plaintiffs from now asserting the right to become stockholders in defendant corporation by having issued to them certificates of stock in the corporation in lieu of the trustees' certificates. We understand appellants concede this to be true.

The important question, then, for us to determine, is whether the trustees' certificates issued to Robert Triplett made him a stockholder in the joint-stock company and in its successor, the defendant corporation. We think this question should be answered in the affirmative.

In reaching a different conclusion, the learned trial judge was doubtless controlled by the opinion of the Supreme Court in the case of Galveston City Co. v. Scott, 42 Tex. 535. That he did regard the decision in that case as conclusive of the question here presented is stated in appellants' brief, and the statement is not questioned by appellees. We think the facts of that case distinguish it from this. The certificate owned by Scott, and upon which his suit was brought, was not issued under the trust instrument before set out, but was one issued by David White under an agreement between him and Menard for the formation of a stock company having for its object the building of a city on the league and labor of land on Galveston Island, granted to Menard, the subdivision and sale of said land for this purpose. The certificate held by Scott was as follows:

"This is to certify that I, Michael B. Menard, by my thereunto legally constituted attorney in fact, David White, for and in consideration of the sum of five hundred dollars to me in hand paid before the sealing and delivering hereof, do hereby grant, bargain and sell to Andrew J. Yates, his heirs and assigns, one thousandth part of my estate and interest in the league and labor of land situated on and including the east end of Galveston Island, and granted to me by the government of Texas, by act of Congress, passed on the 9th day of December, Anno Domini 1836. And I do hereby include and nominate and create the said Andrew J. Yates my associate, under the provisions of the said act, and lawfully authorize him by all necessary means, by the use of my name or otherwise, to pursue and receive from the said government of Texas, according to the provisions of the said act, a perfect title to the same; provided, that the said Andrew J. Yates or his assigns shall and do well and truly pay, or cause to be paid to me or my lawful attorney, or my executors, administrators, or assigns, the further sum of ———. And in default of any of such payments that the said estate and interest hereby granted shall revert to me as of my first and former estate; and provided, also, that the said Andrew J. Yates, shall have and hold the said interest and estate, under and subject to the articles of covenant and association made and entered into by and between me and my other associates, purchasers of my former and remaining interest in the said land.

"In witness whereof, witness my hand and seal this second day of February, A. D. 1837.
"[Signed] David White. [L. S.]"

The Supreme Court held that this certificate was in the nature of a deed and conveyed a 1/1000 part of the league and labor of land "to be held subject to certain articles of agreement and association with other persons who should hold similar deeds for shares in said land, which articles were attached to and made a part of the deed and described the terms and conditions upon which such association was afterwards to be formed and put into action." Chief Justice Roberts, who wrote the opinion in the case, then discusses the facts which show that no association or joint-stock company was ever organized in pursuance of the agreement under which this certificate was issued; that the contract with White was repudiated by Menard, who thereafter entered into the agreement with Triplett and others, before set out, under which the Galveston City Company was organized. The conclusion necessarily followed from these facts that the holders of the White certificates did not, by virtue of such ownership, become stockholders in the Galveston City Company, which was formed by different parties and under a different agreement from that under which the White certificates were issued. It was further held that if the trust agreement before set out, under which the joint-stock com-

pany was formed, should be construed as giving the holders of the White certificates the right to exchange them for trustees' certificates, and thus become stockholders of the Galveston City Company, that right ceased to exist when all of the stock authorized to be issued under said agreement had been issued to other parties, and, in the language of the opinion, the "door closed" through which the holders of the White certificates might have become stockholders in the company.

The certificates issued to Triplett, and upon which this suit is based, including the preamble and notation at the beginning of the certificates, were in the following form:

"City of Galveston in One Thousand Shares.

"The proprietors, M. B. Menard, Robert Triplett, Sterling Neblett and Wm. Fairfax Gray, conveyed to the undersigned, as trustees, by their deed of the 15th of June, 1837, a league and labor of land containing 4,605 acres, on the east end of Galveston Island, to be sold as joint stock in 1,000 shares.

"By the terms of said deed certificates of shares when issued are to be assigned by indorsement under hand and seal, in the presence of two witnesses, before any justice of the peace or notary public.

"The trustees, any two of whom may act, are to call a general meeting of the shareholders when deemed advisable.

"In the proceedings of the stockholders in general meeting each share to be entitled to one vote, and to be represented in person or by proxy, and a majority in interest to determine all questions which may arise. The company may prescribe such rules and regulations for its government and management, and give such orders and directions to the trustees for the sale of lots, or any other purpose, as it may think promotive to the general interest."

"Certificate of Stock. Book ...... No. .....

"This is to certify that we, ...... trustees of the city of Galveston, in consideration of ...... do grant, bargain and sell ...... his heirs and assigns forever, one share No. ......, in the city of Galveston, to be holden and enjoyed by him and his assigns upon the terms prescribed in the deed bearing date the 15th of June, 1837, of M. B. Menard, Robert Triplett, Sterling Neblett and William Fairfax Gray, constituting us the trustees, and in the agreement entered into between us and the stockholders in said City, as set forth in the proposals for subscription.

"Witness our hands this ......
"..............
"..............
"Trustees."

The proposal for subscription referred to in the certificate was as follows:

"Proposals for Sale of Stock in Galveston City.

"This property lying on the east end of Galveston Island, in Texas, consisting of 4,605 acres of land, has been conveyed by the proprietors to the undersigned, Levi Jones, William R. Johnson and Thomas Green, to be sold as joint stock, in one thousand shares.

"As trustees they offer six hundred shares for sale, at $1,500 each, and when the whole shall be subscribed, ten per cent. on each share shall be payable, and the residue in six, twelve and eighteen months from that date, in equal payments. So soon as the ten per cent. shall be paid, and satisfactory assurances be given for the punctual payment of the residue, cer-

tificates of stock will be issued to the subscribers, and a general meeting called to make arrangements for the sale of lots, etc.; four hundred shares having been disposed of without the agency of the trustees, they can sell only six hundred, and if more be taken priority of date in subscription will give preference. The conflicting claims to this valuable townsite having been adjusted, the title is offered with entire confidence as unquestionable.

"Levi Jones,
"Wm. R. Johnson,
"Thomas Green.
"Richmond, June 20, 1837."

These certificates purport to be certificates of shares of stock in a stock company, and cannot be regarded as mere deeds of conveyance to an undivided interest in the land upon which the city of Galveston was located. They refer to the trust agreement under which they were issued, and by the terms of that agreement the holders of the certificates issued thereunder were made stockholders in the joint-stock company thereafter to be organized.

It was expressly provided in the trust agreement that each share represented by said certificate should be entitled to one vote in the organization of the stock company, and that such shareholder might vote by proxy. It was further expressly provided that so many of the 400 shares set aside to Jones for the purposes stated in the trust instrument as remained unsold should be voted by Menard, and that of the unsold portion of the 600 shares provided for in said instrument two-thirds should be voted by Menard and one-third by Triplett.

On the 13th day of April, 1838, these stockholders met and perfected the organization of the company by the election of officers. This meeting was called and held in accordance with the provisions of the trust instrument. The trustees made report to the stockholders of the number of shares sold, and the stockholders represented at the meeting proceeded to elect a president, and secretary, and board of directors for the company which they named "Galveston City Company." At a meeting of stockholders held December 31, 1838, it was directed that a charter be applied for and obtained as soon as possible, and that as soon as same could be had the secretary should open a book for the transfer and registration of stock of the kind used in the transfer of bank stock, "in order that the dividends of the company might be correctly disbursed." If no charter could be obtained from the Congress then in session, the secretary was directed to procure said stock registration book at once, and it was declared to be the duty of the holders of trustees' certificates to file and register them and secure in lieu thereof a certificate under the seal of the company, which would be transferable only on the books of the company, "and shall be necessary in every case to enable the shareholders to receive the dividends due him." A "journal" was also ordered to be kept in which the sale of all

lots should be recorded. These books were opened and kept as directed, and are now in the possession of the defendant corporation, and show a complete record of all the stock transactions and the sale of all lots since the organization of the company. It is thus seen that there was no "failure of the scheme" for the organization of this company, as there was of the scheme to organize the company contemplated by the agreement between Menard and White, under which the certificate sued on in the Scott Case was issued. The holders of the trustees' certificates issued under the trust agreement before set out became original stockholders in the company organized under such instrument, and were not, as were the holders of the White deeds or contracts, required to "take steps to force themselves into the organization." They became stockholders of the company by virtue of their ownership of the trustees' certificates, and we do not think there is anything in this record which shows that they have lost their original standing as such shareholders.

[2] We will here dispose of another point made by appellees, which is that, whatever might be the rights of the owners of trustees' certificates issued before the conveyance of the land by the trustees to the board of directors elected by the stock company, said trustees had no authority to issue certificates after they had conveyed the property to the board of directors, and, the certificates sued on in this case having been all issued after that time, the holders of such certificates did not by such ownership become stockholders in the company.

This contention, at first blush, seems plausible; but, when the trust instrument and the manner in which the company was formed and the purpose of its organization are considered, its unsoundness is apparent. The stock company was really formed when the trust agreement was made. That instrument is the charter of the company, and all that was lawfully done thereafter in completing and perfecting the organization of the company was done under its authority, and the rights and liabilities of the shareholders and the powers of the company or the corporation in acts affecting such rights and liabilities are to be measured by its provisions. The parties who executed that instrument owned the land which was to be the capital of the company which they agreed to form. They agreed that 1,000 shares of stock should be issued, each share to represent a $1/1000$ interest in the capital of the company, the land, and these shares were divided among them in proportion to their interest in the land. At the time the stock company completed its organization and elected its board of directors, all of the unsold shares in the company, except those remaining of the 400 set apart for the redemption of certificates issued under a prior trust agreement, belonged one-third to Triplett and two-thirds to Menard. Neither the company nor the corporation as such ever had any shares of stock for sale, and neither could therefore issue original certificates of stock. The only character of certificates ever issued by either was one in renewal of a canceled trustees' certificate.

If any one desired to purchase stock in the company or the corporation, he could only purchase from a prior holder or from the trustees authorized by Menard and Triplett to sell the shares set apart to them by the trust agreement.

The conveyance of the land to the company in no way affected the trustees' authority to act for Menard and Triplett in the sale of their stock.

The ownership of the unsold stock being in Menard and Triplett, and the certificates therefor having been prepared and placed with the trustees appointed by the trust instrument to be disposed of by them for the benefit of the owners, the right of said trustees to sell the stock and issue certificates in accordance with the provisions of the trust deed, after they had conveyed the title to the land to the company, cannot be doubted. The arrangement might have been changed after the conveyance of the land to the directors of the company so as to provide that the unsold stock thereafter issued should be issued by the company; but, as all of such stock was owned by Menard and Triplett, the company would have been required to account to said owners for the proceeds of its sale, and it tended to simplify matters to allow the authority to dispose of such stock to remain with the trustees appointed by the trust instrument. This was the course pursued, and the validity of the stock thus issued and the standing of the owners thereof as shareholders in the company and subsequent corporation were never questioned until shortly before this suit was filed.

[3] The method adopted in the formation of the company and the issuance of the stock may have been crude and irregular, but this could not affect the rights of the parties as between themselves. The rights of third parties have not intervened. All of the present stockholders acquired their stock with full notice of the rights of the holders of trustees' certificates as shareholders in the corporation. These rights have been expressly recognized and acquiesced in by the corporation ever since its organization, and it cannot at this late day take advantage of any technical defect in the method adopted for the issuance of the stock, and on this account deny to its holders the rights of stockholders in the corporation.

All stockholders in the joint-stock company were, by the express terms of the act of incorporation passed by the Congress of the Republic of Texas in 1841, made stockholders in the corporation. This act is as follows:

173 S.W.—32

"Section 1. Be it enacted by the Senate and House of Representatives of the Republic of Texas, in Congress assembled, that the stockholders in the Galveston City Company be, and they are hereby incorporated under the same name and style, and under it may transfer their rights by succession or assignment, and shall be persons in law capable of suing and being sued, pleading and being impleaded, answering and being answered unto, defending and being defended in all courts and places whatsoever; and also that they and their successors, by the same name and style, shall be in law capable of holding and of conveying any estate, real, personal or mixed, and doing and performing all things which are necessary, and not contrary to the Constitution of this republic.

"Sec. 2. Be it further enacted, that the management of the affairs of said company shall be conducted by a board of five directors, each of whom shall own at least five shares of the capital stock of said company, and three of said directors shall constitute a quorum, to do and perform all the business necessary to the successful operations of said company. A majority of said directors shall appoint a president from their own number, and fill such vacancies as may from time to time take place, from death, resignation or otherwise. The election of directors shall take place in the city of Galveston, on the first Monday in November, of each and every year, and in case of failure to so elect said directors, the corporation shall not be dissolved for that cause, but the president and directors for the time being shall continue in office until there shall be an election; provided, also, that it shall be the duty of said directors to call a meeting of the stockholders, at an early day, to elect the directory so omitted to be done at the regular period.

"Sec. 3. Be it further enacted, that each stockholder shall have one vote for each share that he may own, and may vote in person or by proxy.

"Sec. 4. Be it further enacted, that the president and directors shall have authority to adopt all such rules and regulations and by-laws, as they may consider necessary for the proper management of the affairs of said company.

"Sec. 5. Be it further enacted, that it shall not be lawful under this act for the company to exercise banking privileges in any form ,whatever."

The holders of trustees' certificates, being by virtue of such ownership stockholders in the joint-stock company, were by said act of incorporation made stockholders in the corporation.

At the time the act of incorporation was passed, less than half of the original trustees' certificates had been exchanged for renewal certificates issued by the stock company. That the holders of these unexchanged trustees' certificates were among the persons who were incorporated as "the stockholders of the Galveston City Company" was expressly held in the Scott Case, supra.

The resolution of the stockholders, before referred to, which was passed December 31, 1838, is as follows:

"Ordered, that so soon as a charter of incorporation of the company can be procured (or sooner, if it is not done during the present session of Congress), the agent can be required to open a book for the registration and transfer of stock in a mode similar to that usually adopted in transfer of bank stock, in order that the dividend, arising from sales may be correctly and rightfully disbursed and paid over to the proper parties.

"Ordered, that due notice of the time of opening the books of transfer shall be given, as to which it shall be the duty of the holder of certificates to file and register them, receiving in lieu thereof a certificate under the seal of the company, stating the number of shares to which the party is entitled, which last certificate shall not be transferable except on the regular books of transfer of the company, and shall be necessary in every case to enable the shareholder to receive the dividend due him."

If the company could by a resolution of this kind forfeit or destroy the rights of a stockholder who failed to comply with the direction to surrender his original stock and receive a renewal certificate therefor, we think it clear that it was not the intention of the company in the passage of this resolution to attempt any such forfeiture. The intention was merely to provide an accurate and convenient method of bookkeeping in order that the distribution of the dividends could be expeditiously made and made to the persons entitled to receive them. That no forfeiture of the rights of the holders of trustees' certificates who failed to comply with the requirement of this resolution was intended is conclusively shown by the fact that no such forfeiture was ever declared, and the holders of the original trustees' certificates have always been regarded by the corporation as stockholders and their rights as such respected. Many of the original trustees' certificates were not exchanged for renewal certificates until many years after the passage of this resolution, and the right to such exchange at any time seems never to have been questioned until just before this suit was brought.

At a stockholders' meeting held December 24, 1856, the following resolution was passed:

"Resolved, that holders of the 40 outstanding shares of Galveston City stock, issued by Levi Jones, Thomas Green and Wm. R. Johnson, as trustees, and commonly known as trustee stock, shall not be entitled to draw dividends thereon or to vote either in person or by proxies, in meetings of stockholders, until they shall have surrendered the shares held by them and taken out renewed certificates, in compliance with the by-laws on that subject.

"Resolved, that notice of the foregoing resolution be given to nonresident shareholders by publication in the New Orleans Delta, the Richmond Inquirer and the New York Journal of Commerce."

[4] What we have just said in regard to the resolution of December 31, 1838, applies also to this resolution. Notice to the holders of the 40 outstanding trustees' certificates that they could not draw dividends nor vote their stock until such certificates were surrendered and renewal certificates issued therefor was not notice of an intention on the part of the corporation to attempt to forfeit such certificates of stock unless they were exchanged for renewal certificates, and no forfeiture of the stock can be predicated upon such resolution.

[5] We think sound reason and the weight of authority supports the general proposition that a corporation which holds its capital and assets in trust for the benefit of its stockholders cannot successfully plead limi-

tation or lapse of time against the assertion by a stockholder of his rights as such, and that the general rule that a trustee cannot plead limitation against the demand of his beneficiary unless there has been a repudiation of the trust and notice thereof brought home to the beneficiary, is applicable to the relations which exist between a corporation and its stockholders.

In the case of Kobogum v. Jackson Iron Works, 76 Mich. 498, 43 N. W. 603, the Supreme Court of Michigan passed upon this question, which arose upon the following facts: The president and secretary of the Jackson mining company, an unincorporated joint-stock company, gave Marji Gesick, an Indian, a document May 30, 1846, to the effect that he was entitled, for services in pointing out ore land for the company, to $31/_{100}$ interest of said mining company in said land. In 1848, the Jackson Company was incorporated for a period of 30 years. At an early meeting a resolution was unanimously adopted, reciting, in substance, that 18 shares issue to the Indians, and directing a committee to report how certificates of stock should be issued to them. In 1877, the corporation was reincorporated. No provision was made for these shares in the reincorporation. The Indian, Marji Gesick, had died about 1857. His heirs filed suit on the written instrument, in 1878, against the new corporation for certificates and dividends. At the time of suit a large amount of profits had accrued to the corporation. The court says:

"If complainants are heirs of Marji Gesick, they have a right to their share in the property and its results, unless barred by some rule of law. It is claimed that they have lost their rights by laches. * * * Marji Gesick was recognized by name on the record of the corporation as holder of a certificate entitling him to a paid-up interest in the company, and a committee appointed to provide for giving him new evidences of it. The recognition was unconditional and absolute. The records do not show that any further action was ever taken. * * * No further action was needed on his part at law, or in equity, so long as his rights, appearing of record, were not repudiated. If dividends were earned and proper notice given of them, the lapse of time might act as on their recovery. * * * There is no law which terminates the interest of a stockholder without some adverse action asserting its extinction or denying its existence, or which compels him to seek aid from courts when no such adverse position is taken. * * * It must be remembered further that this is a case where a trustee, with notice on its own records of Marji Gesick's rights, is seeking to get rid of his rights."

The same ruling was made in Bedford County Turnpike Co. v. Nashville Ry. Co., 14 Lea (Tenn.) 525, and Owingsville Turnpike Co. v. Bondurant, 107 Ky. 505, 54 S. W. 718. Cook on Corporations (6th Ed.) vol. 2, states the rule to be that limitation does not begin to run against a stockholder's right of action to recover dividends until after a refusal by the corporation of his demand.

Applying these principles to the facts of this case as alleged in the petition, the plea of limitation or of laches cannot be sustained.

[6] The facts alleged show that there has been no repudiation by the defendant corporation of its trust relation to the holders of the stock issued to Robert Triplett. On the contrary, it is alleged that the rights of such stockholders have been continuously recognized by the corporation, and up to a short time before the filing of the suit the corporation was ready and willing to account to such stockholders for their interest in the assets of the company whenever demand should be made therefor by parties who should show themselves to be the owners of such stock. There having been no adverse claim on the part of the corporation, and no act having been done by it, previous to its recent refusal to recognize plaintiff's rights, which could be regarded as a repudiation of the rights of the holders of outstanding trustees' certificates, such holders are not precluded by lapse of time from now asserting their rights.

We think the facts alleged in the petition are sufficient to authorize a finding that the trustees' certificates sued on were never transferred by Robert Triplett, that he owned them at the time of his death, and that they are lost.

Triplett died in 1853. No dividend was declared upon any of this stock until 1876, since which $32,500 has been paid in dividends upon each of the shares of stock, except the 9 shares represented by trustees' certificates which were never exchanged for company or corporation certificates, and five of which are the shares involved in this suit. It is a reasonable inference from these facts that Triplett delayed exchanging these certificates for renewal certificates because of the fact that the company was earning no dividends, and therefore there was no occasion for his procuring a renewal certificate; the only advantage to accrue to him by such renewal being that he could not otherwise collect dividends.

It is also a reasonable inference that, if Triplett had transferred these certificates, the holder would have, in all these years in which large dividends have accrued, presented the certificates for renewal in order that he might collect the dividends.

It seems to us that the most reasonable conclusion from the facts is, as claimed by appellants, that Triplett owned the shares at the time of his death, and that they are lost and if in existence will never be discovered.

[7] If it develops, upon hearing of all the evidence adduced upon the trial, that an indemnity bond should be required to fully protect the defendants in accounting to plaintiffs as the owners of said lost certificates, the trial court has authority to so adjudge. Galveston City Co. v. Sibley, 56 Tex. 269.

[8] The various acts of recognition of the validity of the certificates issued to Robert

Triplett on the part of defendant company alleged in the petition are not sufficient to show estoppel on the part of the company to deny the validity of such certificates, but they may be properly considered as evidence tending to establish such validity.

[9] The parties to the original transaction are dead, and if any ambiguity or doubt exists as to the rights of the holders of trustees' certificates issued under the trust instrument, which, as before said, must be regarded as the charter of the company thereafter formed and by which appellants' rights are to be measured, the construction placed upon that instrument and the rights accorded the holders of such certificates by those who participated in the formation and subsequent management of the company, as shown by their acts, are circumstances which may properly be considered in determining the question of the character and extent of the rights of such certificate holders.

In what we have said, we think the material questions presented by this appeal have been determined, and it would serve no useful purpose to discuss more fully or in detail the various points presented by the exceptions to the petition and by appellants' assignments of error.

We cannot bring ourselves to believe that appellants have lost their rights as stockholders in the company by their failure to sooner assert them.

If the allegations of the petition are true, appellants are the owners of five shares of the original stock of the company, and as such owners are entitled to their proportionate part of the assets of the company, and there is no rule of law which would permit appellees to deprive them of their interest in such assets and appropriate it to themselves.

We are of opinion that the judgment of the court below should be reversed, and the cause remanded, and it is so ordered.

Reversed and remanded.