YEAMAN et al. v. GALVESTON CITY CO. et al. (No. 7204.)

(Court of Civil Appeals of Texas. Galveston. Nov. 17, 1916. Rehearing Denied Dec. 14, 1916.)

1. CORPORATIONS ⬤⇒109 — STOCK-LOST CERTIFICATES—DUPLICATES.

Where an owner of certificates of stock in a company which have been destroyed procures the issuance of an equal number of duplicate certificates and sells them and they are redeemed by the company, the fact that some of the duplicates are erroneously numbered gives him no further right against the company for shares under the original certificates.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 462; Dec. Dig. ⬤⇒109.]

2. TRIAL ⬤⇒139(1)—CASE FOR JURY.

Though plaintiff makes out a prima facie case on undisputed evidence, some rebutting evidence alone carries the case to the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341; Dec. Dig. ⬤⇒139(1).]

Appeal from District Court, Galveston County; Robt. G. Street, Judge.

Suit by Robert Triplett Yeaman and others against the Galveston City Company and others. From an adverse judgment, plaintiffs appeal. Affirmed.

Geo. E. Mann, of Galveston, and Ramsey, Black & Ramsey, of Austin, for appellants. Maco Stewart, Barret Gibson, and James B. & Charles J. Stubbs, all of Galveston, and Clarence Milheiser, of Houston, for appellees.

PLEASANTS, C. J. This suit was brought by appellants as heirs and devisees of Robert Triplett, deceased, to establish their ownership of five shares of stock in the appellee company, a corporation chartered by an act of the Congress of the republic of Texas passed on February 5, 1841, and to recover the accrued and unpaid dividends on said stock and their interest as such shareholders in the property of the corporation in event of its dissolution, which had been voted for by the remaining stockholders.

The pleadings of plaintiffs and defendants are very lengthy, and will not be set out in this opinion. This is the second appeal of the case. Upon the trial from which the former appeal was prosecuted the trial judge sustained numerous exceptions to plaintiffs' petition, and in the opinion of this court rendered on that appeal, which is reported in 173 S. W. 489, there is a full statement of the pleadings. On motion for rehearing this court certified the main questions raised on the former appeal to the Supreme Court, and the opinion of that court in answer to the certified questions (167 S. W. 710) affirmed the judgment of this court reversing and remanding the cause.

The opinions referred to held that the owners of stock certificates issued by trustees appointed by the joint owners of the property, which constituted the capital of the company, before a charter was granted and the corporation organized, became by virtue of such stock ownership stockholders in the corporation, and, being such stockholders, the defenses of laches and stale demand were not available against the assertion of their rights, and that limitation was not available as a defense to a suit by the owners of such stock to establish their rights as stockholders in the corporation in the absence of proof of repudiation by the corporation of the trust relation existing between it and the holders of said trustees' certificates. These questions, having been settled on the former appeal, will not be discussed in this opinion. The five shares of stock to which plaintiffs seek to establish ownership are numbered 184 to 188, inclusive, out of Book E of the so-called trustees' stock of the Galveston City Company.

In addition to a general denial and pleas of limitation, the defendants specially pleaded that all of the stock ever owned by Robert Triplett in the Galveston City Company was sold and transferred by him in his lifetime and was redeemed from his assignees by the company in accordance with its by-laws. They further pleaded a compromise and settlement with the executors of the will of Robert Triplett of all claims of his estate to the ownership of stock in defendant corporation.

The cause was tried in the court below without a jury, and resulted in a judgment in favor of defendants. The findings of fact and law filed by the learned trial judge sustain each and all of the defendants' pleas stated above. The appellants, under an appropriate assignment of error, assail each and all of these findings.

---

The evidence establishes the following facts:

"In 1836 the Congress of the republic of Texas authorized the sale to M. B. Menard and associates of the league and labor of land on the east end of Galveston Island, upon the payment by Menard of $50,000. The associates of Menard were nine persons, and did not include Robert Triplett, Neblett, Gray, or Green. On June 15, 1837, Menard, joined by Triplett, Neblett, and Gray, conveyed said land to Johnson, Jones, and Green as trustees, authorizing said trustees to issue 1,000 shares to be evidenced by certificates, and to sell 600 of same at not less than $1,500 per share, and directing that 400 certificates that had previously been issued by Jones should be regarded as 400 of said 1,000 shares. Any two of the trustees were authorized to act. It is provided the land shall be held subject to the orders of the shareholders; any party in interest had the right to purchase shares to be charged up to such interest.

"The trustees had printed and bound in five books, lettered A, B, C, D, and E, a large number of blank certificates, there being in each of the books A, B, C, and D 200 certificates signed in blank by Green and Jones, trustees. Book E contained 210 blank certificates signed in blank by Johnson and Green, trustees. The trustees sold only 17 certificates (and these 17 were out of Book E and sold to one Coleman); they failed to sell any others. Failing to sell the certificates, Jones and Menard left Book E at Richmond, Va., in the hands of the trustees Johnson and Green, for the Virginia interests, and returned to Galveston, and there divided the other certificates among Menard and his associates.

"On April 13, 1838, there was organized at Galveston an unincorporated association styled the Galveston City Company; it not now being known or ascertainable who participated in said organization, beyond the fact that M. B. Menard was elected president, and McKinney, Williams, Baker, and Hardin elected directors, and Levi Jones appointed secretary. Minutes of the meeting effecting this organization are preserved and held among the archives of defendant Galveston City Company. The trustees of 1839 conveyed said land to the officers of said unincorporated association styled Galveston City Company. The company laid out said land into town lots, the site of the city of Galveston, and adopted the policy of selling lots for credit, and accepted in payment for lots and for debts the trustee certificates that had been issued by said trustees. The company issued certificates in the name of said company from time to time, accepting trustees' certificates (issued by the trustees, Jones, Green, and Johnson), in exchange for certificates of stock in the Galveston City Company.

"In December, 1838, the Galveston City Company passed a by-law declaring it the duty of the holders of trustees' certificates issued by the trustees, Green, Jones, and Johnson, to surrender same and take out in lieu thereof a certificate in the name of the company, stating the number of shares to which the party was entitled.

"On February 5, 1841, the Congress of Texas, incorporated 'the stockholders of the Galveston City Company' 'under the same name and style.' The corporation thus created continued to operate with the same officers and on the same plan and method that existed prior to incorporation. In 1838, Menard having paid the $50,000, received a grant of land from the republic of Texas, and in 1842 Menard conveyed said land to the corporation.

"Triplett is not shown to have participated in any of the proceedings of the Galveston City Company, unincorporated or incorporated. He lived at Yellowbanks (afterwards Owens-boro), Ky. Green delivered to him 37 trustees' certificates out of Book E, including certificates Nos. 184, 185, 186, 187, and 188, now in suit. These 37 were all the certificates ever owned by Robert Triplett, except Nos. 189 and 190, hereinafter mentioned. Of these 37 certificates, 12 were transferred by Triplett and by his transferees returned to the company at an early date. Of the remaining 25 certificates Robert Triplett transferred one to William S. Triplett and 24 to John R. Triplett. In 1842 the 24 certificates held by John R. Triplett were destroyed by fire in Richmond, Va., and application was made by said John R. Triplett to the trustees Green and Johnson at Richmond for the issuance of 24 duplicate certificates in lieu of those destroyed. Robert Triplett's order to the trustees for the issuance of certificates to John R. Triplett is as follows:

"'Owensboro, Jan. 28, 1843.

"'Messrs. W. R. Johnson & Thomas Green:

"'Whereas, I heretofore transferred to John R. Triplett twenty shares of Galveston stock, being shares No. 830 to 850, inclusive, and also one share to William Triplett, No. 851, and three other shares in my own name, held by him, you will please issue in the name of same Jno. R. Triplett twenty-four shares from 830 onward.                    Robert Triplett.'

"There is a patent ambiguity in this order. Certificates Nos. 830 to 850 would be 21 and the 3 others held by John R. Triplett in the name of Robert Triplett would make the 24 for the issuance of which the order was given; the certificate owned by William Triplett not being included in the order. This was the construction placed upon it by the parties, as only 24 certificates were issued."

John R. Triplett died before these duplicate certificates were issued, and his executor and his devisee requested said trustee to issue such 24 certificates to Robert Triplett, which was done, a mistake being made in the numbering of the duplicates. But the full number of 24 duplicate certificates being then issued to Robert Triplett. These 24 then represented the entire interest of Robert Triplett. He transferred 21 of said duplicates to A. T. Burnley and transferred 3 of them, being Nos. 50, 51, and 53, to James Hewitt. The 21 so transferred to Burnley were by the latter presented to and taken up by the company.

In the settlement by the company with Burnley, as assignee of the 21 duplicate certificates issued to Robert Triplett, it was discovered that original certificates 45 and 52, for which duplicates of like numbers had been issued, were not destroyed by fire as claimed by John R. and Robert Triplett, but had been transferred by Robert Triplett and redeemed by the company from his assignees. The duplicates were, however, redeemed by the company, and, it appears from an entry on the books of the company, were charged against unissued certificates Nos. 199 and 200 in said Book. E. When duplicates Nos. 51 and 53 were presented to the company for redemption by the assignee of Robert Triplett, it was also found that the originals for which these duplicates had been issued had not been lost in the fire as claimed by the Tripletts, but had been theretofore transferred by Robert Triplett and redeemed by the

company. Upon the refusal of the company to recognize these duplicates Triplett settled with his assignee therefor, and the company issued to Triplett in lieu of said duplicates certificates Nos. 189 and 190. This occurred in 1845. The settlement with Burnley above mentioned occurred on December 25, 1847. In 1846 the Galveston City Company gave notice that the originals of the 24 trustees' certificates which were lost in the Triplett fire and for which duplicates had been issued would not be recognized by the company after January 1, 1847. But after said date said:

"Duplicate certificates of stock will be received and new certificates [of the corporation] issued to the legal holders thereof and the original [trustees'] certificates barred from any claim upon the company unless in the meantime they shall be presented at the office of the Galveston City Company in Galveston."

Robert Triplett knew in 1846 that this order and notice of the company had been made and issued. Triplett died a widower in 1853, by will leaving his estate to his three children (who were also his heirs at law), and appointing three executors, Wing, Weir, and Pegram, who duly qualified in Kentucky. Wing and Weir in 1860 executed a power of attorney to Pegram, authorizing the latter to make demand and claim on the Galveston City Company of all right, interest, and claim of every character of Robert Triplett in, to, and against said company, and especially any rights under said certificates Nos. 51, 53, 189, and 190, authorizing Pegram to compromise and settle with said company. Pegram came to Galveston in 1860 and made a settlement and compromise with said company.

The direct evidence as to what was included in this settlement, as might be expected after this lapse of time, in the absence of a written memorandum of the terms of the settlement, is not definite and certain. Wm. P. Ballinger, James P. Cole, secretary of the company, and C. B. Adams represented the company in effecting the settlement. All of those who made the settlement are long since dead. The only written evidence of the settlement are the indorsements on certificates 189 and 190 and an indorsement on the envelope in which those certificates were found, with other papers, in the files of the company. On the back of each of the certificates there is the following indorsement:

"For three thousand dollars to us paid by C. B. Adams, we hereby assign the within share of stock to the Galveston City Company to the credit of said C. B. Adams.

"Witness our hands and scrawls for seals this 27th of January, 1860. W. B. Pegram, James Weir, S. M. Wing, Executors of Robert Triplett, by W. B. Pegram, Attorney in Fact of said Weir and Wing. Witnesses: Sydney T. Fontaine. George H. Treat.

"Done in my presence this 27th January, 1860. J. P. Cole, Chief Justice C. C."

There is written on the back of the envelope the words "Triplett Compromise." This indorsement on the envelope is in the handwriting of Mr. Ballinger.

Sydney T. Fontaine testified in the case:

That he was present when the settlement was made, and signed as a witness the transfers and indorsements on the certificates above set out, and that to the best of his recollection the settlement "purported to be a settlement of any interest held by Robert Triplett in the Galveston City Company, which papers signed by me as a witness will show for themselves. It was a settlement between the estate of Robert Triplett, deceased, and C. B. Adams for the interest of the estate in the Galveston City Company and a considerable sum of money passed. I saw it, but did not count it. The money was paid by Adams or for him to W. B. Pegram, and the settlement seemed complete and satisfactory to all parties present."

The executor of the estate of Robert Triplett, James Weir, presented a final account in the settlement of said estate which was approved by the county court of Daviess county, Ky., in which the administration of the estate was pending, on June 18, 1878. After the settlement in 1860, above mentioned, no claim was made by the executors of Robert Triplett's will, nor by any of his heirs or devisees themselves, to any interest in the Galveston City Company, until shortly before this suit was filed.

It is agreed by the parties in this case that the five identical original trustees' certificates E-184 to E-188, inclusive, claimed to be owned by appellants, have never been surrendered to or taken up by the company. It is further agreed that James P. Cole, secretary, reported to the company from time to time the number of outstanding certificates, including original trustees' certificates and renewal certificates issued by the corporation, and that in all of these reports the trustees' certificates in controversy are shown to be outstanding. The last report made by him showing these certificates to be outstanding was in 1884. Wm. S. Triplett was the executor of John R. Triplett, and as such signed the request for the issuance to Robert Triplett of the 24 duplicate certificates in lieu of the 24 lost in the fire.

There was introduced in evidence a book belonging to the defendant company and known as "Agent's Report and Stock Register," in which is entered an account of the 1,000 shares of trustees stock, and on this book the 5 shares in controversy in this suit appear to have been issued to Robert Triplett, and do not appear thereon to have been surrendered to the company.

There is evidence showing that at least one trustees' certificate other than those in controversy has been redeemed, and no record of such redemption is disclosed by the books or the papers now in possession of the company. The books further show that one trustees' certificate was redeemed twice. The evidence further shows that during the war between the states the books and papers of the company were several times taken to Houston and returned to Galveston.

It would serve no useful purpose and

would greatly lengthen this opinion to discuss in detail the various assignments of error presented in appellants' brief and we shall not so discuss them.

[1] The trial court held that duplicate certificates Nos. 45, 51, 52, and 53 were not void because of the fact that the original certificates bearing said numbers and which were supposed to have been destroyed in the Richmond fire were not in fact destroyed, and had been redeemed by the company before the duplicates were offered for redemption, but that said duplicates were valid and proper evidence of the right of the holder to four shares of the 24 of the stock of the company represented by the 24 certificates which were destroyed, and in lieu of which the 24 duplicates were issued, and that, all of the other 24 certificates lost in said fire having been accounted for, these four erroneously numbered certificates should be held to have been issued in lieu of 4 of the certificates in controversy. The court further held that the certificate sold to William Triplett was the remaining one of the 5 certificates. The evidence shows that of the 37 certificates of stock originally issued to Robert Triplett 12 were redeemed by the company before the fire occurred in which 24 of the original 37 certificates were destroyed. The affidavit and statement of John R. and Robert Triplett that 24 of said 37 certificates were lost in the fire are uncontradicted, and so is the statement of Robert Triplett that he had sold the remaining one of said 37 certificates to Wm. Triplett. The evidence further shows that none of the five certificates in controversy were included in the 12 that were redeemed by the company prior to the fire, nor was the certificate which had been transferred to Wm. Triplett among said number. We think this evidence fully justifies, if it does not compel, the finding that 4 of the 5 certificates were destroyed by the fire, and that the other one was the certificate that had been transferred to Wm. Triplett. There being no evidence to show any ownership or right of appellants to the certificate that was sold by Robert Triplett to Wm. Triplett, the above finding that said certificate was one of the 5 in controversy disposes of appellants' claim to one of the shares involved in this suit. Appellants very earnestly contend that the trial court erred in holding that the duplicate certificates 45, 51, 52, and 53 were not void and could be held to represent other lost certificates than the originals having the same numbers as said duplicates. This contention is thus stated in their brief:

"We contend in the first place, substantially, that a duplicate certificate, like a duplicate check, or any other duplicate for that matter, represents in law and in fact only the original certificate or check or other paper which it purports to represent. We further contend that, when a duplicate certificate or duplicate check is issued as such, marked on its face as a duplicate, and it develops that the original certificate or check had been surrendered before the dupli-

cate, that the duplicate becomes and is void, being issued only as a mere substitute for the original supposed to be lost, and when the original turns up the duplicate becomes both in law and in fact and in accordance with the intention of the parties, a nullity. We further contend in the same connection that such a duplicate stock certificate or check cannot then be regarded as valid and as representing an entirely different share or original certificate from the one which the parties designated in issuing it. Whatever may be the general rule as to the rejection of numbers as applied to original certificates of stock, it can have no application to duplicate certificates. If duplicate certificates of stock do not represent the original certificates which they purport to represent, then they represent nothing. They are issued merely as substitutes for the original certificates of the same book and number supposed to be lost or destroyed, and when it develops that the original certificate was not lost or destroyed, but in existence and had been honored, the duplicate certificate containing on its face evidence of its own weakness, becomes a nullity. We acknowledge that there is some force in the reasoning of the trial court as applied to original certificates, though we do not concede it to be correct as thus applied, but it has no application to duplicate certificates. There is no principle of law or rule of business practice that would authorize duplicate certificates definitely numbered and marked and issued as duplicates to be held to represent any other or different shares of stock than the shares evidenced by the original certificates of the same numbers."

We do not think the general rule as to the essential character and validity of duplicate instruments, invoked by appellants in support of their contention, can be applied in this case. It goes without saying that a bank, having paid an original check supposed to be lost, cannot thereafter pay a duplicate issued by the drawer and hold the drawer responsible for such payment. But there is no analogy between the payment by a bank of a duplicate check after it had paid the original and the redemption by appellee in this case of the duplicate certificates of stock which had been erroneously numbered. In the case of the duplicate check the drawer cannot be required to make a double payment, and for a like reason the appellee should not be required to redeem original lost certificates after it had redeemed duplicates thereof merely because said duplicates were erroneously numbered. We think this can be illustrated by comparing the certificates of stock to certificates of deposit issued by a bank. Suppose a bank issues two certificates of deposit, Nos. 45 and 52, for $500 each. The original depositor sells No. 45, which the purchaser collects from the bank, and the other, No. 52, is lost in a fire. Upon representation of the depositor that certificate No. 45 was the one destroyed the bank issued a duplicate certificate No. 45 for $500, which the depositor also sells, and upon presentation by the purchaser is paid by the bank. We do not think it would be contended in the case stated that the depositor could recover from the bank the $500 originally represented by the lost certificate No. 52. He through his assignees has received from the bank all that it owed him,

and there is no rule of law nor principle of equity that would permit him to recover more because the duplicate was erroneously numbered. So it is in this case. Robert Triplett procured the issuance of 24 duplicate certificates in lieu of the 24 which were destroyed. He sold all of these duplicates, and all of them have been redeemed by the company, and he could not, nor can his heirs, require the company to account for more than 24 shares on the ground that 4 of said duplicate certificates were erroneously numbered. As between the holders of original certificates Nos. 45, 51, 52, and 53 and the holder of the duplicates, of course the duplicates would have been invalid, and if the 5 certificates had not been destroyed and had been sold by Triplett, the duplicates would not affect the rights of the holders of the originals. This is all that is decided in the cases of Keller v. Eureka Brick Co., 43 Mo. App. 84, 11 L. R. A. 472, Benton v. Martin, 40 N. Y. 345, and other cases cited and relied on by appellants to sustain their contention.

The evidence shows that when duplicate certificates Nos. 45 and 52 were redeemed by the company they were charged against unissued certificates E–199 and E–200, which it appears from the evidence Robert Triplett was entitled to have issued to him. This transaction occurred in 1847, six years before the death of Robert Triplett, and we agree with appellants' counsel that it must be presumed that Robert Triplett knew of this transaction and knew that the company had canceled unissued certificates Nos. 199 and 200. After this lapse of time we think the evidence before set out is sufficient to sustain the finding that there was a settlement between the company and Triplett for any claim he may have had against it for said unissued certificates. We think it may well be doubted whether in this suit, which is to establish the rights of his heirs in the company by virtue of his ownership of certificates Nos. 184 to 188, inclusive, they could recover the interest that they might have by virtue of his ownership of certificates Nos. 199 and 200, but we do not deem it necessary to decide this question.

In so far as duplicate certificates Nos. 51 and 53 are concerned, the undisputed evidence shows that, when their redemption was refused by the company and they were presumably redeemed or repurchased by Triplett from his assignee, Burnley, the company issued to Triplett in lieu of said duplicates certificates Nos. 189 and 190, which were afterwards redeemed by the company from Triplett's estate, and there can be no question of his having received from the company his interest in these two of the five shares now claimed in the company by plaintiffs. What we have before said in regard to the certificate sold to Wm. Triplett dis-

poses of the remaining interest claimed in this suit.

We think all of the facts and circumstances, considered together, justify the conclusion that Robert Triplett, his assigns and estate, have long since received from the appellee company all interest in said company which Triplett ever owned by virtue of his original ownership of the five shares of stock in controversy, except the one share sold by him to Wm. Triplett, and the plaintiffs in this suit show no right to recover the interest in the company represented by said share.

We do not regard the various reports made by the secretary of the company prior to 1884 showing nine outstanding trustees' certificates, including the five involved in this suit, as at all conclusive of the fact that said certificates had not been settled for. We agree with the trial judge that in view of all the evidence this report meant nothing more than that the identical nine certificates had never been returned to the office of the company, and it was not known what had become of them or in whose hands they might be.

[2] In the conclusions of law filed by the trial judge he says:

"It has been urged by plaintiffs' counsel that the true rule of law, where the plaintiff has made out a prima facie case on indisputable evidence, is that in the absence of the establishment of an affirmative defense a peremptory legal presumption arises in favor of plaintiff. I do not so understand the law. The accepted view, I understand it, in this state and everywhere else, is that, if the defendant offers some rebutting evidence (as in the case at bar of the transfer by plaintiffs' ancestor of the stock sued for), such evidence alone carries the whole case to the jury. It is thus, for instance, that this court, in the exercise of its exclusive province as a jury, in dealing with the facts of the case, determines the insufficiency of the evidence to establish as a fact the plaintiffs' ownership of the stock in question."

We think this is a correct statement of the law, and that the evidence justified the trial court in finding that plaintiffs had failed to establish their ownership of the stock in the company claimed by them, and in rendering judgment for the defendants.

We have considered all of the assignments of error presented in appellants' brief, and, in our opinion, none of them should be affirmed.

It follows that the judgment of the court below should be affirmed; and it has been so ordered.

Affirmed.